**UNITED STATES of America, Appellee,**

v.

**Frank WINGATE and Kenneth Luke Smith, Appellants.**

**Nos. 1057, 1058, Dockets 75–1065, 75–1067.**

United States Court of Appeals, Second Circuit.

Argued May 28, 1975.

Decided Aug. 4, 1975.

Certiorari Denied Jan. 19, 1976. See 96 S.Ct. 858.

Sheila Ginsberg, New York City (William J. Gallagher, Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant Wingate.

Joyce Krutick Barlow, New York City (Barlow, Katz & Barlow, New York City, on the brief, Robert A. Katz, New York City, of. counsel), for appellant Smith.

Thomas M. Fortuin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., on the brief, Lawrence S. Feld, Asst. U. S. Atty., of counsel), for appellee.

Before CLARK, Associate Justice,* HAYS and MANSFIELD, Circuit Judges.

HAYS, Circuit Judge:

Frank Wingate and Kenneth Luke Smith appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a jury trial. Wingate and Smith were convicted of conspiring to distribute heroin in violation of 21 U.S.C. § 846 (1970).[1] We affirm.

## I.

In June, 1974, Marell Tyre, who had been arrested and charged with the importation of cocaine, agreed to cooperate with agents of the Drug Enforcement Administration. He called Frank Wingate from DEA headquarters in Miami and began to negotiate for the purchase of an eighth of a kilogram of heroin. Later in June Tyre came to New York and made further calls to Wingate about the price and quality of the heroin to be purchased. During one of these conversations, New York City police officer Robert J. Heyward, posing as an associate of Tyre, also spoke to Wingate. The two men discussed the price of the heroin and the method of payment. Wingate made several references to his

"man," implying that he had to check with his "man" before making any final decisions.

The next day, as arranged in the telephone conversation, Wingate, Heyward, and Tyre met at the Crotona Bar in the Bronx. According to Heyward's testimony, Wingate said that he had missed his "man" at the appointed hour but that "[m]aybe my man will bring the package [of heroin] when he comes to the bar." Later, a man and a woman drove up-in a green Toronado and Wingate went out to speak to them. He then told Heyward that he did not have the heroin but that he needed $3,100 of the agreed upon $6,200 purchase price in advance. He told Heyward that he would be back shortly with the drugs. Heyward paid him and Wingate drove off in the Toronado. About an hour later Wingate returned to the bar and repaid the $3,100, telling Heyward that he suspected that he was being followed and would have to postpone the deal. Wingate agreed to call Tyre to set up the deal sometime in the future.

Shortly thereafter Tyre called Wingate from Virginia and was told to come back to New York. When Tyre arrived at LaGuardia Airport, he called Wingate at the Crotona Bar and arranged to meet him at the airport for the purpose of negotiating the sale of heroin. Wingate told him that his "man" was with him and that he would bring his "man" to the airport. At 2:10 A.M. Wingate and Smith drove up to the American Airlines Terminal. Wingate got out and met with Tyre. He noticed two DEA agents seated in a car nearby and pointed them out to Tyre. Smith drove up and Wingate told him to drive by the agents to see what they were doing. Smith told Wingate to "hurry up." The two proceeded to case the area until they were arrested by DEA agents.

* Of the Supreme Court of the United States (retired), sitting by designation.

1. The appellants were also charged with two counts of attempting to distribute heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 846 (1970), but the district court directed verdicts of acquittal on these counts.

After his arrest, Smith was advised of his rights by Special Agent Korniloff of the DEA. He nevertheless told Korniloff that he had met Wingate that night at the Crotona Bar; that he had agreed to get heroin for Wingate to sell to a customer; and that he and Wingate had gone to LaGuardia to get the money. The next day Smith signed a statement containing information about his plans to obtain the heroin and identifying Wingate as his co-conspirator.[2]

Before trial the district judge held a hearing on Smith's motion to suppress his statement on the ground that it was not made voluntarily. At the hearing Smith testified that he took Wingate to LaGuardia because Wingate had asked him for a ride. He testified further that he was a heroin addict and that he was suffering withdrawal pains when he was taken to DEA headquarters. He denied that he had conspired with Wingate to sell heroin and claimed that he signed the statement because of assurances from Government agents that if he did so he would be released. The Government witnesses denied that any such assurances were given, and they also testified that Wingate did not exhibit withdrawal symptoms or ask for medical attention at the time he was questioned. The Government also pointed out that in his original affidavit requesting a hearing, Smith said only that he was a co-

caine user and that he was ill when brought to the courthouse; no claim of heroin addiction, with its severe withdrawal pains, was made until the hearing. The district judge denied the motion to suppress.

On December 24, 1974, the United States Attorney's office notified the district court by mail of its intention to introduce against Smith "written and/or oral statements" which he had made after his arrest. Included was a copy of the statement signed by Smith with a proposal that portions referring to Wingate be deleted to comply with *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The letter assured the court that any Government witnesses testifying about Smith's oral statements would be instructed to avoid mentioning anything which incriminated Wingate. The court subsequently approved the admission of the written statement with all mention of Wingate removed, see note 2 *supra,* and a defense motion for a severance was denied.

At the trial the Government introduced Smith's redacted statement, and Korniloff testified as to his oral statements. The court cautioned the jury to consider the statements only against Smith and not against Wingate. Smith did not testify. Wingate testified and admitted that he had attempted to get narcotics for Tyre from a man identified

---

2. The text of the statement was as follows:

"*Q. O.K. you're charged with Frank Wingate of conspiring to sell heroin. Do you understand that charge?*
*A. Yes.*
Q. You told the agent you were going to get the heroin from Bumpy, is that right?
A. That's right.
Q. How much heroin was it?
A. Well he didn't know exactly what it was but he must have thought maybe it was an eighth.
Q. Was Bumpy waiting for you last night?
A. No.
Q. How were you going to get in touch with him?
A. Well I'd ive seen him, gone around to his house.
Q. Where's Bumpy's house?
A. 223rd Street.

Q. What's Bumpy look like?
A. Short, stocky, wear glasses. About 42, 43.
Q. Does he have bumps on his face?
A. Yeah, shaving bumps.
Q. What color is he?
A. Black.
Q. Where does he live on 223rd Street?
A. 2nd floor, 1063.
Q. How much were you going to get for this?
A. I couldn't tell you. I'd probably've took some of it, took some of the money, if there was some money.
*Q. What was Frank Wingate supposed to do?*
*A. He might of.*
*Q. He set it up, right, he set you up?*
*A. Right.*" (The italicized portions were not shown to the jury.)

only as Ray. He also admitted accepting the $3,100 from Heyward at the Crotona Bar for purposes of purchasing narcotics. He denied that Smith was involved in the matter and claimed that he only asked him for a ride to the airport. Wingate's counsel offered to introduce Smith's suppression hearing testimony, but the Government objected that it had not cross-examined Smith at that time for trial purposes. Noting that Wingate had already "confess[ed] that he was in a narcotics conspiracy," the court sustained the objection. The case was submitted to the jury which found Wingate and Smith guilty of conspiracy.

## II.

■ Wingate's primary argument is that the admission of Smith's oral [3] and written statements was reversible error. We disagree.

■ At the time the written statement was introduced and again in his charge to the jury, the district judge instructed the jury to consider those statements only in relation to Smith and to disregard them as to Wingate. The Supreme Court has indicated that such instructions, though ineffective against "powerfully incriminating" statements, may be effective in less severe circumstances:

> "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

*Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

See *Frazier v. Cupp,* 394 U.S. 731, 735, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). As the district court held, cautionary instructions are ineffective under *Bruton* only where the extrajudicial statement admitted into evidence is "clearly inculpatory" as to the complaining co-defendant and is "vitally important to the government's case." *United States v. Catalano,* 491 F.2d 268, 273 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. Cassino,* 467 F.2d 610, 623 (2d Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973). Cf. *Frazier v. Cupp, supra* at 735, 89 S.Ct. 1420. We hold that since the statements admitted here, as redacted, were neither clearly inculpatory as to Wingate nor vitally important to the case against him, the court's cautionary instructions were sufficient to protect his sixth amendment rights under *Bruton.*

The written statement submitted to the jury made no mention of Frank Wingate. It dealt solely with Smith's efforts to obtain heroin from a Mr. Bumpsie. The testimony of Agent Korniloff as to oral statements made to him by Smith also excluded mention of Wingate. Korniloff quoted Smith as telling him that he had been asked by someone at the Crotona Bar to get heroin for a customer; that he told him that he could obtain it from Mr. Bumpsie; and that the two drove to the airport to arrange things.

■ In addition, whatever the importance of the statements to the case against Smith, they were far from vital to the case against Wingate. The jury

---

**3.** Relying on *United States v. Glover,* 506 F.2d 291, 298 (2d Cir. 1974), Wingate argues that the prosecution violated its "duty" to inform the court before trial that it intended to use Smith's oral statements against him. We reject this argument on two grounds. First, responding to the suggestion in *Glover,* the United States Attorney's office did inform the court of its intention to use "written and/or oral statements" made by Smith. The Government's bill of particulars also stated that Smith made oral statements similar to his written statement. Second, while *Glover* strongly suggests that the prosecution bring potential *Bruton* problems to the attention of the court before trial, 506 F.2d at 298 & n.14, it does not impose a duty on the prosecutor to do so.

had tape recordings of the telephone conversations in which Wingate discussed with Heyward and Tyre his plans to obtain heroin from his suppliers. It had the testimony of Heyward covering the meeting at the Crotona Bar and Wingate's references to his "man." It had testimony concerning Wingate's arrival at LaGuardia with Smith after telling Tyre that he would bring his "man" with him. Finally, it had what amounted to a confession by Wingate on the stand that he had indeed conspired to distribute heroin.[4]

Wingate nevertheless argues that his conviction should be reversed because Smith's statements appear to incriminate him when they are read in light of other evidence presented at the trial. Wingate points out that Smith refers in both the written and oral statements to an unidentified individual who participated in the venture. In the oral statement he also refers to that individual as meeting with him in the Crotona Bar and driving with him to LaGuardia Airport. Since, Wingate argues, the evidence links him generally to a narcotics conspiracy and specifically to the Crotona Bar and to a trip with Smith to LaGuardia, the statements in effect identify Wingate as Smith's co-conspirator and their admission therefore requires reversal despite the court's instructions.

We again disagree. The courts have held that a defendant's statement is admissible at a joint trial, with cautionary instructions, even though other evidence in the case indicates that an unmentioned co-defendant was also involved in the activities described in the statement. *United States v. Trudo,* 449 F.2d 649, 652–53 (2d Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972); *United States ex rel. Nelson v. Follette,* 430 F.2d 1055, 1058 (2d Cir. 1970), cert. denied, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971); *Posey v. United States,* 416 F.2d 545, 550–51 (5th Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970); *Slawek v. United States,* 413 F.2d 957, 960–64 (8th Cir. 1969). In *United States ex rel. Nelson v. Follette, supra,* defendant Biggins confessed that he and "Oliver" had participated in a robbery and murder. Co-defendant Nelson objected to admission of the confession at their joint trial on the ground that other evidence identified him as "Oliver." We rejected his argument on the ground that "Biggins' statements were not clearly inculpatory because they *alone* did not serve to connect Nelson with the crime." 430 F.2d at 1058 (emphasis added). Here, too, Smith's statements did not incriminate Wingate. Only when combined with considerable other evidence, which amply established Wingate's guilt, do the statements tend to implicate him. We hold that Smith's statements were not "powerfully incriminating" as to Wingate, within the meaning of *Bruton,* and therefore could be admitted against Smith at the joint trial with proper instructions to the jury.[5]

### III.

Smith argues that the introduction of his statements into evidence requires the reversal of his conviction on two grounds. First, he claims that he was arrested without probable cause and that any statements which were made pur-

---

4. Wingate mistakenly argues that his case was submitted to the jury solely on the theory that he conspired with Smith and that Wingate's testimony as to his conspiracy with "Ray" was therefore not sufficient to prove his guilt. In fact, the district court clearly instructed the jury that it should consider the case of each defendant separately and that it could find one guilty of conspiracy and the other innocent. Under these instructions, Wingate's testimony as to his dealings with Ray was strong proof of his guilt though it did not implicate Smith.

5. We are not persuaded by the argument that the court's instructions were vitiated by the prosecutor's remark to the jury that deletions had been made in Smith's written statement. Viewing the remark in context, we are convinced that the prosecutor did not intend to link Wingate to the statement and that the jury was still able to adhere to the court's instructions to disregard the statement in connection with Wingate.

suant to his arrest were therefore inadmissible under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Second, he contends that his statements were made involuntarily in violation of the fifth amendment privilege against self-incrimination. Both of these arguments are without merit.

More than a month before trial, Smith moved to suppress his statements on the ground that they had been made involuntarily. On the day the trial began, he made an additional motion to suppress on the ground that material submitted to his counsel by the Government pursuant to 18 U.S.C. § 3500 (1970) indicated that there had been no probable cause for his arrest. The district judge denied the second motion as untimely and proceeded to hold a hearing on the question of voluntariness.

■ Regardless of whether the second motion was indeed untimely, it is clear that there was probable cause for Smith's arrest. At the time of the arrest, Wingate had been under surveillance for weeks and clearly appeared to be engaged in a narcotics conspiracy. He had told Tyre that he would meet with him with "his man," a term previously used to describe either his supplier or an accomplice. Wingate arrived at the meeting place with Smith, who was later seen meeting with Wingate and Tyre. After Tyre and Wingate concluded their meeting, Smith was observed casing the area together with Wingate. These circumstances were clearly "sufficient to warrant a prudent man in believing that the [appellant] had committed or was committing an offense," *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), and the agents therefore had probable cause to arrest him.

■ At the suppression hearing, Smith testified that he had made the challenged statements because of his withdrawal pains and promises that he would be returned to the "street" if he cooperated. On appeal, Smith claims for the first time that he made the statements because Agent Korniloff led him to believe that the car he had driven to the airport would be impounded if he did not cooperate. Since no drugs had been found in the car, Smith argues that the possibility of impoundment was not raised in good faith but rather as a threat to coerce him into confessing. However, the record indicates only that Korniloff, in response to an inquiry by Smith, told him that he would check to see if the car was subject to seizure. There is no evidence of even an implicit threat to have the car impounded if Smith did not cooperate. Furthermore, under 21 U.S.C. § 881(a)(4) (1970), a vehicle is subject to seizure if "used, or . . . intended for use, to transport, or in any manner to facilitate the transportation" of heroin. In the circumstances of this case it was perfectly legitimate for Korniloff to answer Smith's question about the car by telling him that he would have to inquire into the possibility of seizure. The situation here is in no way comparable to *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), relied upon by Smith, in which the mother of two young children was threatened with the loss of both welfare support and the custody of her children if she did not cooperate. See also *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (friend on police force falsely stated that his job would be in jeopardy if suspect did not confess). We affirm the holding of the district court that Smith voluntarily confessed after he intelligently and knowingly waived his constitutional right to remain silent.

Since Smith's statements were admissible against him, there is no merit in his additional contention that there was insufficient admissible evidence to sustain his conviction.

### IV.

■ Finally, Wingate argues that his conviction should be reversed because the court refused to allow him to intro-

duce Smith's suppression hearing testimony into evidence. Wingate claims that that testimony was exculpatory as to him because Smith repudiated his earlier statements about participation in a conspiracy with Wingate and claimed to be an innocent bystander at the LaGuardia meeting with Tyre. Since Smith asserted his fifth amendment right to remain silent at trial, Wingate contends that admission of the suppression hearing testimony was necessary.

The Government argued successfully in the district court that the suppression hearing testimony should be excluded because the Government could not cross-examine Smith at the trial and had not had an opportunity to cross-examine him as to Wingate's guilt at the hearing. We agree.[6]

■ Testimony given at a previous trial or at a pre-trial hearing by a presently unavailable witness is inadmissible at a subsequent trial unless the issues in the two proceedings are sufficiently similar to assure that the opposing party had a meaningful opportunity to cross-examine when the testimony was first offered. See *Peterson v. United States,* 344 F.2d 419, 422–24 (5th Cir. 1965); 5 Wigmore, Evidence §§ 1386–87 (Chadbourne ed. 1974); Cf. Rule 804(b)(1), Federal Rules of Evidence (eff. July 1, 1975). The issue at the suppression hearing in this case was not whether Wingate was guilty or innocent but rather whether Smith's confession was made voluntarily so that it could be used in the Government's case against him. The

Government therefore had no meaningful opportunity to cross-examine Smith as to Wingate's involvement in a narcotics conspiracy, which was the issue on which Wingate later sought to introduce his testimony.[7]

Relying on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) and related cases, Wingate argues that the suppression hearing testimony should have been admitted into evidence despite the absence of meaningful cross-examination because it had sufficient "indicia of reliability." We disagree. In *Chambers,* the Court held that an out-of-court admission by McDonald that he had committed the murder with which Chambers was charged could be introduced into evidence by the defense. Unlike the self-serving statements by Smith which Wingate seeks to introduce, McDonald's statements were devastatingly adverse to his penal interest. 410 U.S. at 300–01, 93 S.Ct. 1038. Furthermore, McDonald, unlike Smith, was presently available for cross-examination by the prosecution. Id. at 301, 93 S.Ct. 1038. Finally, there was independent corroboration, including eye-witness testimony, that McDonald's statements were accurate. Id. at 300, 93 S.Ct. 1038. No such corroboration was introduced as to Smith's statement. We therefore hold that Smith's testimony lacked "indicia of reliability" and was properly excluded by the district court.

■ Wingate also argues that his conviction should be reversed because of prosecutorial misbehavior. Specifically,

---

**6.** The Government also argues that the court's exclusion of the suppression hearing testimony was not reversible error because the testimony was not exculpatory as to Wingate and because Wingate's own testimony erased any reasonable doubt as to his guilt. Because we accept the Government's position that it did not have the opportunity for a meaningful cross-examination, we need not reach its other arguments.

**7.** Wingate argues that the issue of his guilt was brought up at the hearing by his counsel

and that the Government was thereby put on notice that it should cross-examine Smith not only on the voluntariness of his confession but also on Wingate's guilt or innocence. However, as the record indicates, Judge Frankel rejected counsel's request to question Smith on Wingate's involvement:

"I don't think that it is appropriate for this proceeding. We are having a motion to suppress now and I don't want to bring in anything that somebody happens to think of. Your application is denied."

he objects to the United States Attorney's statement in summation that the drug laws would be useless if the defendants were allowed to go free. The district judge told the jury at the time that these statements were "rhetorical" and that it should concentrate on the evidence. We hold that this instruction was sufficient to cure any prejudice which may have been caused by the prosecutor's statements.

Affirmed.

MANSFIELD, Circuit Judge (concurring):

I concur in the result and in all of Judge Hays' characteristically thorough and carefully considered opinion except that portion holding that *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), does not preclude the introduction of a defendant's statement inculpating his co-defendant unless the identification of the co-defendant as the person inculpated appears on the face of the statement, without reference to any other evidence in the case. I believe the proper rule to be that if the statement, when viewed in the light of the other evidence in the case, clearly inculpates the co-defendant, it may not be received against him.

In the present case Special Agent Korniloff testified that upon arrest Smith

> "said that he had met *an individual* earlier that evening at the Crotona Bar and that *this individual* had asked him to obtain some heroin for him for a customer who he intended to later meet at LaGuardia Airport.
>
> \*   \*   \*   \*   \*   \*
>
> "So *they* both got into Mr. Smith's vehicle and went to LaGuardia Airport. . . ." (Emphasis supplied).

Other evidence established—indeed it was undisputed—that the only "individual" who arrived at LaGuardia Airport with Smith in his automobile to negotiate the narcotics deal was Wingate. Thus the jury was well aware that the "individual" referred to by Smith was Wingate, whom Smith's statement inculpated just as clearly as if it had referred to Wingate by name.

Since the jury knew that the "individual" referred to by Smith was inevitably Wingate, *Bruton* cannot be avoided on the ground that Wingate was not referred to by name. *Serio v. United States,* 131 U.S.App.D.C. 38, 401 F.2d 989 (1968). Our decisions relied upon by Judge Hays do not point in the opposite direction. In *United States v. Trudo,* 449 F.2d 649 (2d Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972), confessions were redacted so that they "only inculpated the person making the admission and in no way inculpated his co-defendants," 449 F.2d at 652. Although there was some dispute about the inculpatory effect of the statement admitted in *United States ex rel. Nelson v. Follette,* 430 F.2d 1055 (2d Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971), we concluded that the reference to one "Oliver" did not, because of conflicting evidence as to physical characteristics, clearly inculpate the co-defendant Nelson. In contrast, Smith's statement, by inculpating the "individual," clearly inculpates Wingate.

Although Smith's statement inculpated Wingate on the conspiracy charge I agree, for the reasons stated by Judge Hays, that the evidence was not vitally important to the government's case against Wingate, in view of Wingate's own admissions and the other incriminatory evidence introduced against him. Indeed, even if the admission of Smith's statement against Wingate were considered to be error, it was harmless beyond a reasonable doubt. Accordingly, I join in affirming the judgments of conviction.