UNITED STATES of America, Appellee,

v.

Jose GONZALEZ and Jose Vicente Costano, Defendants-Appellants.

Nos. 693, 694, Dockets 76–1523, 76–1524.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1977.

Decided May 6, 1977.

Lee J. Robbins, New York City (Fredric Lewis, New York City, of counsel), for defendant-appellant Gonzalez.

Stuart R. Shaw, New York City, for defendant-appellant Costano.

Nathaniel H. Akerman, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., and Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before ANDERSON, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Jose Gonzalez and Jose Vicente Costano appeal from judgments of conviction entered on October 6, 1976, in the United States District Court for the Southern District of New York, after a trial before the Honorable Charles L. Brieant, Jr., United States District Judge, and a jury.

The indictment charged the two defendants in two counts with violations of the federal narcotics laws.[1] The jury found each defendant guilty on both counts.[2]

The jury could have found these facts.

On July 13, 1976, at 11:45 p. m. Jose Gonzalez entered the Hi-Hat Bar at 858 Eighth Avenue, in Manhattan and met with Louis Sorrentino. Shortly thereafter, Gonzalez left the bar and placed a phone call at a public telephone located at the corner of Eighth Avenue and West 52nd Street. Gonzalez said only one word into the phone and hung up the receiver. He then walked around the block and returned to the Hi-Hat Bar.

Approximately fifteen minutes after the telephone call, Jose Costano appeared on Eighth Avenue. Gonzalez waved him into the Hi-Hat Bar where both men had a brief discussion with Sorrentino. Following this meeting, Gonzalez and Costano went to the Iberia Restaurant at 250 West 47th Street where they remained for approximately 45 minutes. From the restaurant, Gonzalez and Costano went by taxi to an apartment building at 305 East 24th Street, where Gonzalez used a key to enter the building's rear door.

On the following evening, July 14, 1976, just before midnight, Gonzalez was in front of a coffee shop located on the corner of 52nd Street and Eighth Avenue. After a brief conversation with Sorrentino, Gonzalez repeated his pattern of conduct of the previous night. He placed a call from the public telephone located at the corner of Eighth Avenue and West 52nd Street, spoke briefly, hung up the receiver and walked round the block he had similarly circled the previous evening. He then returned to the Hi-Hat Bar, which he entered.

Approximately five minutes after Gonzalez had gone into the bar and fifteen minutes after the call had been placed by Gonzalez, Costano left a taxicab at the corner of West 51st Street and Eighth Avenue. As he left the cab he wrapped a magazine around a brown bag which he held in his hands. Jeffrey Hall, a Special Agent with the Drug Enforcement Administration, then approached Costano, displayed his Drug Enforcement credentials and said that he was a Federal Agent. At that point Costano shoved Agent Hall and ran. Costano was subdued and arrested by Agent Hall and several other Special Agents. The bag which Costano had concealed in the magazine under his arm contained nine ounces of cocaine.

To prevent Gonzalez from learning of Costano's arrest, Costano was immediately placed in a Drug Enforcement car and taken to another location where Agent Hall, speaking in Spanish, again identified himself as a Federal Agent, told him he was

---

1. Count One charged both defendants with conspiracy to violate the federal narcotics laws commencing on January 1, 1976, and continuing to July 23, 1976, in violation of Title 21, United States Code, Section 846. Count Two charged both defendants with distributing and possessing with the intent to distribute nine ounces of cocaine on July 15, 1976 in violation of Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.

2. Judge Brieant sentenced Costano to concurrent terms of imprisonment of eight years on each count to be followed by three years' special parole. Gonzalez was sentenced to ten years' imprisonment on each count, to be followed by three years' special parole, with the sentences to run concurrently.

under arrest for violating the federal narcotics laws, advised him of his constitutional rights and proceeded to question him. Costano agreed to cooperate. When asked about the cocaine, Costano replied that a man, whom he had met a few days earlier in a bar and whose name he did not know, had given him the bag earlier that evening and had told him to deliver it to another man who would be waiting for him near the corner of 51st Street and Eighth Avenue. When asked whether the set of keys found in his pocket belonged to the man who gave him the cocaine, Costano answered in the affirmative. Costano admitted also that he was from Colombia and that he was in the United States illegally.

After Costano had been questioned, Agents Hall and Richard Crawford went to 305 East 24th Street and tested the keys. The agents found that one of these keys turned the lock for a mail box and that another key turned the lock for Apartment 19G where Gonzalez lived.

After Costano had been arrested, Gonzalez paced back and forth in front of the Hi-Hat Bar for over an hour and a half during which time he placed two calls on public telephones. When he realized Costano was not going to appear, Gonzalez took a cab to 305 East 24th Street. He went directly to Apartment 19G. Agents Hall and Crawford were waiting outside the apartment. When Gonzalez told them that he was, in fact, Jose Gonzalez, he was arrested. When asked about the keys which the agents had in their possession, Gonzalez said that he had lost them a week or two ago, and when asked where he had been that evening, Gonzalez said he had been at the movies.

Both Gonzalez and Costano were brought to the headquarters of the Drug Enforcement Administration for processing. At one point they were brought face to face. Each, out of the other's presence, denied knowing the other.

The next day, July 15th, Gonzalez and Costano were individually questioned at the United States Attorney's Office. Both defendants then admitted knowing each other. Gonzalez said that he had given Costano refuge for one night because he did not have anywhere to go. Costano stated that he had received the cocaine from a man named Johnny Ortiz whom he had met in a bar and who had asked him to deliver it to another man at 51st Street and Eighth Avenue. Gonzalez again claimed that he had been at the movies the previous evening. Although he could not remember the name of the movie, he described its theme as concerning the devil and the woman. Gonzalez also stated that he had never done any business with Costano and had never asked him to take a package for him.

At trial, Gonzalez did not present a case. Costano did not take the stand.[3]

## I.

Costano contends that his arrest was not based upon probable cause and that therefore the search incident thereto was invalid. Costano contends that since the informant had not previously given information sufficient to demonstrate his reliability, his information did not constitute probable cause to arrest Costano. He relies upon *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The District Judge, after a hearing, denied suppression.

The relevant facts are these. On July 13, 1976, Richard Crawford, a Special Agent, received a telephone call from a confidential informant, who told him that at approximately midnight a Colombian male, about 35 to 40 years old, medium build, would be at the Hi-Hat Bar on Eighth Avenue in New York City to meet with Louis Sorrentino to arrange for the purchase of one-quarter kilogram of cocaine. At a meeting shortly before midnight the informant confirmed that this meeting be-

---

**3.** Costano called Abby Robinson, a free-lance photographer, to identify photographs taken by her on September 27, 1976, at the location near the Hi-Hat Bar where Costano had been arrested. Two of these photographs were admitted into evidence.

tween the Colombian male and Sorrentino was still scheduled to take place.

At approximately 11:30 p. m. Agent Crawford and Agent Hall entered the Hi-Hat Bar and observed Sorrentino present in the bar. Ten minutes later a Latin male (later identified as the defendant Jose Gonzalez) matching the description given by the informant entered the bar and spoke to Sorrentino. After a five to ten minute conversation, Gonzalez left the bar followed by Agent Hall.

Agent Crawford then met with the informant in the men's room of the Hi-Hat Bar. The informant told Crawford that Gonzalez would be receiving a sample of cocaine from another Colombian male and that the sample would be given to Sorrentino.

After Gonzalez left the bar, he placed a call from a public telephone on the corner of 57th Street and Eighth Avenue, walked around the block and returned to the bar. The subsequent events of the evening, observed by the agents, have already been recounted.

When Gonzalez and Costano entered the Iberia Restaurant, Agent Crawford received a radio message that the informant had called his number at the Drug Enforcement Administration to say that he had the sample of cocaine given to Sorrentino. Agent Hall maintained surveillance at the Iberia Restaurant and Agents Crawford and Kelley left to meet the informant. The informant gave Agent Crawford a small plastic bag containing a small amount of cocaine, stating that this was the sample of cocaine that had been delivered to Gonzalez and that Gonzalez had given to Sorrentino. The informant also told the agents that at midnight of the next evening Sorrentino would receive delivery of a quarter kilogram of cocaine from Gonzalez at the Hi-Hat Bar. The informant said that this delivery would take place in the same way the sample had been delivered. Gonzalez would arrive at the Hi-Hat Bar and once it was apparent that the deal was set to take place, he would telephone his contact (Costano) who would make the delivery.

Agents Crawford and Kelley then rejoined Agent Hall outside the Iberia Restaurant and at approximately 1:45 a. m. Gonzalez and Costano left the restaurant. They took a cab to Second Avenue and East 25th Street and went into the rear entrance of 305 East 24th Street. The security man at that building told the agents that the only person who would have access to the rear door on East 25th Street was someone who lived in the building.

On July 14, 1976, at 11:15 p. m. Agent Crawford met with the informant who confirmed that the meeting between Sorrentino and Gonzalez was still scheduled to take place that night.

At approximately 11:45 Agent Crawford and other agents established surveillance at the Hi-Hat Bar. The results of their surveillance, including the arrest of Costano, have already been described.

All of the information which the informant had received about this case and which he had relayed to Agent Crawford had been received by the informant from the defendants Costano and Gonzalez. In addition, Agent Crawford had received information from this informant on two occasions prior to July 13, 1976. On one occasion the informant gave him a name, address and unlisted telephone number with the New York telephone company and Crawford verified that the unlisted telephone number was registered to the address which had been furnished by the informant. On the second occasion, the informant gave Crawford a description of a car and license number. A check of the license plate with the Motor Vehicle Bureau of the State of New York revealed that it was registered to the same type of car which the information had described.

■■ The test under *Aguilar* and *Spinelli, supra*, requires the Government to show (1) that the informant received his information in a reliable way; and (2) that the informant was "credible." In this case, the informant obtained all his information directly from Gonzalez and Costano. This satisfies the criterion of reliability. *United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct.

2075, 29 L.Ed.2d 723 (1971); *Mapp v. Warden,* 531 F.2d 1167, 1171 (2d Cir. 1976); *United States v. Viggiano,* 433 F.2d 716, 719 (2d Cir. 1970), *cert. denied,* 401 U.S. 938, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).

■ Costano contends, however, that the informant here was not "credible" for lack of a track record as an informant who has supplied reliable information in the past. But an informant whose present information is found to be truthful by independent corroboration of the essential elements of his information can establish probable cause. *See United States v. Harris, supra; Mapp v. Warden, supra* at 1171; *United States v. Canestri,* 518 F.2d 269, 272 (2d Cir. 1975). The corroborating evidence need not, of course, establish the crime itself; corroboration of even innocent elements is enough. *United States v. Rollins,* 522 F.2d 160, 165 (2d Cir. 1975); *United States v. Sultan,* 463 F.2d 1066, 1069 (2d Cir. 1972).

In this case, virtually every fact related to Agent Crawford by the informant was fully corroborated by Crawford and the other agents prior to the arrest of Costano. These facts include the informant's description of Gonzalez by nationality, age and physical size, and his tip that there would be a meeting between a Colombian and Sorrentino at the Hi-Hat Bar prior to midnight on July 13, 1976. The informant's additional information, provided to Crawford immediately after this meeting, that Gonzalez would be receiving a sample of cocaine from another Colombian male to give to Sorrentino was corroborated by Gonzalez' telephone call and the arrival shortly thereafter of Costano, the meeting of Gonzalez, Costano and Sorrentino and the subsequent receipt by Crawford of the sample of cocaine from the informant. Furthermore, the informant's information that the sale of the quarter kilogram of cocaine would take place on the following night in the exact same fashion as the delivery of the sample was proven to be precisely correct right up to Costano's arrest. On the second night, the pattern of conduct of the previous night repeated itself. Gonzalez arrived at the Hi-Hat Bar at approximately midnight and met with Sorrentino. Gonzalez left the bar, placed a phone call, walked around the block and waited in front of the Hi-Hat Bar. Fifteen minutes later Costano showed up in a taxicab a short distance from the Hi-Hat Bar carrying a small brown bag which he attempted to conceal by wrapping it in a magazine and placing it under his arm. This corroboration by on-the-scene surveillance was sufficient for the informant's information to constitute probable cause.

## II.

■ Since we conclude that there was probable cause for the arrest, it follows that the search incident to the arrest was valid. Nevertheless, appellant urges that Judge Brieant committed reversible error at the suppression hearing because he refused to conduct an *in camera* hearing to disclose the informant's identity and/or to establish the informant's reliability. In view of our analysis of the probable cause issue, we find this contention to be without merit.

A hearing into the informant's reliability would have been mere surplusage, because the *corroboration* of the informant sufficiently established his reliability. *See United States v. Carneglia,* 468 F.2d 1084, 1088–89 (2d Cir. 1972); *United States v. Comissiong,* 429 F.2d 834 (2d Cir. 1970); *United States v. Tucker,* 380 F.2d 206 (2d Cir. 1967). In *Carneglia,* as here, the issue at the suppression hearing was the existence of probable cause. At the suppression hearing in both cases, an FBI agent recounted the information received from the informer, but did not disclose the informer's identity. In *Carneglia,* as here, the defendant urged that this disclosure was necessary to afford an "effective opportunity to test the existence of probable cause." 468 F.2d at 1088. The *Carneglia* court held, however, that the failure to require disclosure of the informer's identity or to hold an *in camera* hearing was not error, because on-the-scene corroboration of the informer was a "sufficient voucher against fabrication," *id.* at 1088, *quoting Comissiong, supra,* 429 F.2d at 839. We think this reasoning to be dispositive here.

### III.

At trial, defendants renewed their request for identification of the informant. Judge Brieant again refused to require the Government either to identify the informant or produce him at trial.

■ Defendants urge that this refusal denied them their constitutional right of confrontation and their right to a fair trial. They rely on *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In *Roviaro,* the Supreme Court held that it was reversible error "to refuse to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused had knowingly" imported narcotics into the United States. 353 U.S. at 55, 77 S.Ct. at 625. The Court ruled that disclosure is required when it "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61, 77 S.Ct. at 628.

In the case at bar, appellants contend, the informant was a material witness to the alleged criminal acts of the defendants. They conclude that the informant therefore had information which would be "relevant and helpful" to the determination of the issue of defendants' knowledge and intent. We believe that appellants' reliance on *Roviaro* is misplaced. It is not at all clear that the informant was a material witness. The testimony of the FBI agents indicated that the informant was *aware* that a cocaine deal was scheduled to be consummated at the Hi-Hat Bar, but did *not* suggest that the informant would be a witness thereto.

Appellants did not even argue to the District Court that the informant was needed as a material witness. *See United States v. DeAngelis*, 490 F.2d 1004, 1010 (2d Cir.), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). The present allegation that the informant would have been a material witness is sheer speculation, *see, e.g., United States v. D'Amato*, 493 F.2d 359, 366 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct.

43, 42 L.Ed.2d 50 (1974), and the refusal to require disclosure of the informant's identity is generally within the discretion of the trial judge. *United States v. Soles*, 482 F.2d 105, 108–110 (2d Cir.), *cert. denied*, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973).

■ Unlike the situation in *Roviaro,* there is no showing that the informant was an actual participant in the transaction constituting the crime charged, or that the informant played a material role in bringing about the possession; nor that he "helped to set up the commission of the crime and . . . was present at its occurrence." 353 U.S. at 61, 77 S.Ct. at 628. The mere allegation now that the informant might be able to testify to appellant's knowledge and intent is not substantiated by the record. Moreover, the District Judge and defense counsel apparently have assumed, from the fact that the informant obtained samples of Costano's cocaine, that the informant was Louis Sorrentino, the only other person involved in the sale of the cocaine. If such is the case, the defendants have not suffered the type of prejudice held to deny fundamental fairness in *Roviaro.* Sorrentino *was* mentioned by name in the testimony of the FBI agents. His identity as well as address were furnished to the defendants. Appellants had every opportunity to subpoena Sorrentino as a witness. In these circumstances the failure to identify the informant *qua* informant, even if he participated in the transaction, did not constitute prejudicial error.

### IV.

Before trial, Gonzalez moved for a severance on the ground that the Government intended to use statements of Costano not admissible against Gonzalez. In response, the Assistant United States Attorney stated in an affidavit that "the Government does not intend to offer at trial any statements inadmissible under *Bruton v. United*

*States."* [4] The judge accordingly did not ask to see any statements of Costano and denied the severance. Thereafter, at a pretrial hearing, the judge asked the prosecutor whether he intended to use any statement in the absence of the co-defendant taking the stand, to which the prosecutor replied, "Absolutely not." At trial, the Government introduced an oral statement of Costano made to Agent Hall, and also notes of an interview with Costano made by Assistant United States Attorney Levine. Agent Hall testified at trial, in answer to a question of what Costano said about the keys found in his pocket, "He said they weren't his keys. I asked him if the keys belonged to the same person that had given him the cocaine and he said that they did belong to the same person."

In his statement in the United States Attorney's Office, which was also received in evidence, Costano said he had obtained the cocaine from Johnny Ortiz who was not a defendant. Hall testified further that he took the keys to 305 East 24th Street (where he had seen both appellants together) and that one of the keys fitted the mail box for Apartment 19G which bore the name of "J. Gonzalez," and another fitted the apartment door. While there was objection to the naming of Gonzalez, there was no motion for a mistrial and the testimony passed without further notice and, indeed, without a cautionary instruction, though the court instructed the jury generally, at a later point, that the post-arrest statements of Costano "may not be considered by the jury in connection with Mr. Gonzalez' case." The court cautioned the jury again in the same terms when Special Agent Crawford proceeded to relate the interview of Costano conducted by Assistant United States Attorney Levine. As we have noted, Crawford "testified that in this interview Costano said that the name of the individual who had given him the cocaine was Johnny Ortiz."

Thereafter, at a point where Crawford was about to relate an interview with Gonzalez, rather than with Costano, counsel belatedly claimed that the Assistant United States Attorney had stipulated on March 22nd that "the statements made by the defendants will not be read into evidence". After a study of the transcript, the judge ruled that the Government had not stipulated away the right to offer the testimony about the keys, because the Government had stipulated only that it would not use statements "inadmissible under *Bruton*," and that the statement was admissible under *Bruton*. The judge so ruled because in the statement to Assistant United States Attorney Levine, Costano had stated that he got the cocaine from *Johnny Ortiz*, who was not a defendant, and impliedly had *not* received it from Gonzalez. The judge reasoned that Ortiz, who gave Costano the cocaine, according to the latter's statement, could also have given him Gonzalez' keys, of which Ortiz might have had possession.

The judge made this ruling on the basis of the prosecutor's representation that Costano had stated simply that "I got the keys from the man who gave me the cocaine." [5] The court responded: "That's not necessarily incriminating because it doesn't say that the keys *belong* to the man who gave him the cocaine (emphasis added). . . . Ortiz could perfectly likely have *possession* of Mr. Gonzalez' keys without criminality on your client's [Gonzalez'] part."

In fact, both the prosecutor and the judge incorrectly paraphrased Costano's statement. Costano stated to Agent Hall that "the keys *belonged* to the same person who had given him the cocaine" (emphasis added). And the extrinsic evidence was uncontradicted that the keys did belong to Gonzalez.

Despite Judge Brieant's careful distinction between possession of the keys and ownership, the prosecutor nevertheless in his first summation tried to dissuade the

---

4. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

5. The prosecutor notes that if the entire record is read his meaning was not what it seems to be. We do not imply that he intentionally meant to mislead the court or counsel.

jury from believing that it was Johnny Ortiz who had given Costano both the cocaine and the keys.[6]

There was an objection which Judge Brieant sustained "absolutely" and he charged the jury in no uncertain terms that "what Mr. Costano said is no evidence whatsoever bearing on the guilt of Mr. Gonzalez."

Despite the judge's ruling, the prosecutor again referred to the matter, and the court properly advised the jury that "anything Mr. Costano said is out the window so far as Mr. Gonzalez' case is concerned." Recognizing that the matter was "arguable," the judge denied the motion by Gonzalez for a mistrial.

Gonzalez urges that under the rule of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), his constitutional right of confrontation under the Sixth Amendment was violated in spite of the cautionary instructions of the trial judge.

▮ *Bruton* teaches that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." 391 U.S. at 137, 88 S.Ct. at 1628. *Bruton* was the culmination of a long debate among eminent jurists of the efficacy of cautionary instructions when the jury is permitted to hear a statement that is hearsay and inculpatory of a co-defendant, without benefit of cross-examination, which all agree it should not use as a factor in judgment.

Since *Bruton* the Supreme Court has made it clear, however, that a *Bruton* error can be harmless. *Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). This was a reaffirmation of the rulings in *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. In those cases, as in *Brown*, the Court held that where the evidence of guilt was overwhelming and the prejudicial effect of the co-defendant's admission was so insignificant by comparison that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error, the conviction need not be reversed.[7]

This circuit also has had occasion to consider the application of the *Bruton* rule. In *United States ex rel. Nelson v. Follette*, 430 F.2d 1055 (2d Cir. 1970), we laid down a two-pronged exception to the *Bruton* rule: when the jury had to make a substantial inference to identify a co-defendant as the person mentioned in the out-of-court confession, *and* when the evidence, even if incriminatory, could not have constituted a vital part of the Government's case against the co-defendant. The Government relies on *United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975). There we held that a redacted statement from which the name of the co-defendant had been excised was properly admitted, because the jury could only identify the person whose name was excised as the co-defendant by concluding from extrinsic evidence that he *was* the accomplice. *See United States v. Mancusi*, 404 F.2d 690 (2d Cir. 1968); *Serio v. United States*, 131 U.S.App.D.C. 38, 401 F.2d 989 (1968). The admission of the redacted statement was not "vital to the case" against Wingate. *See* 520 F.2d at 313–14. And the extrinsic evidence was itself strong—tape recordings in which Wingate discussed his plans to obtain heroin from his suppliers, testimony concerning his arrival at the rendezvous

---

**6.** He argued as follows:

"The next day he said it was a fellow by the name of Johnny Ortiz. But the fact remains that Mr. Costano said there was another person who gave him that cocaine. In fact, when Mr. Costano was questioned about these keys, ladies and gentlemen, Mr. Costano stated the man who gave him the cocaine is the man who *owns* these keys" (emphasis added).

**7.** In *Harrington,* however, the Court reminded us that the mere fact that the out-of-court confession is not incriminating of the co-defendant in express terms, does not mean that admission of the statement is harmless error. For the circumstances of the case and the details of the confession may make it "as clear as pointing and shouting that the person referred to was" the co-defendant. 395 U.S. at 253, 89 S.Ct. at 1728.

with the declarant, and a practical confession when Wingate was on the stand. 520 F.2d at 314. Judge Mansfield, concurring, believed that the jury was aware that the individual referred to by Smith was Wingate, 520 F.2d at 317, but he based his concurrence on the fact that "the evidence was not vitally important to the government's case against Wingate, in view of Wingate's own admissions and the other incriminating evidence introduced against him." *Id.* The ultimate ground for the *Bruton* decision was that "Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination." 391 U.S. at 128, 88 S.Ct. at 1623.

■ As we have seen, the only evidence against Gonzalez, albeit enough to sustain his conviction, was entirely circumstantial. The only *direct* "evidence" against Gonzalez was the post-arrest statement of Costano inculpating Gonzalez directly, in circumstances in which the declaration could no longer have been in furtherance of the conspiracy. This is a classic case in which we must reluctantly reverse the conviction of Gonzalez for violation of his constitutional right to confront and cross-examine a witness against him. Despite the strenuous efforts of Judge Brieant to contain the harm, the persistence of the prosecutor in linking Gonzalez to the cocaine via his ownership of the keys was unfortunate and made it almost a certainty that the jury was made conscious of it in spite of the judge's instructions to forget it. The identification of Gonzalez as the key owner was the "well-nigh inevitable association" of Gonzalez as the man who supplied the cocaine. *See Serio v. United States, supra,* 401 F.2d at 990, a *per curiam* reversal in which the Chief Justice participated as a Circuit Judge. *See also United States ex rel. LaBelle v. Mancusi,* 404 F.2d 690 (2d Cir. 1968).

The conviction of Costano is affirmed. The conviction of Gonzalez is reversed and remanded for a new trial.