UNITED STATES of America, Plaintiff,

v.

Jose Luis NARANJO–SIERRA, a/k/a "Guillermo Lozano," Defendant.

No. S 78 Crim. 46 (WCC).

United States District Court, S. D. New York.

Sept. 4, 1979.

Laurence H. Levner, New York City, for defendant.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for the United States of America; K. Chris Todd, Asst. U. S. Atty., New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Defendant moves to suppress evidence seized by agents of the Drug Enforcement Administration ("DEA") on January 9, 1978. A suppression hearing was held on July 25, 1979. This Opinion and Order constitutes the Court's findings of fact and conclusions of law.

*The Facts*

In mid-November 1977, about a month and a half prior to the arrest and search of defendant's car, DEA Special Agent Richard Bell ("Bell"), received a telephone call from an informant who told Bell that a man named Jose Luis "was dealing in cocaine and he was expecting a large shipment" and that Jose Luis was "either involved or related to" a narcotics violator known to Bell. (Transcript of the suppression hearing, page 17; hereinafter "Tr. p. ——"). The informant also told Bell that Jose Luis would be in the vicinity of 182nd Street and Valentine Avenue in the Bronx that same evening. Relying on this information, Bell conducted a surveillance and observed Jose Luis enter a Plymouth automobile, New York license plate number 108–GUA. This was not the first time agent Bell had seen this Plymouth. Prior to mid-November, he had seen it being driven by a known cocaine violator whom Bell had arrested (Tr. pp. 20, 40). Subsequently, Bell was again told by the informant that Jose Luis was expecting a large shipment of cocaine and that he had purchased a sample of that expected shipment [1] (Tr. p. 19).

Further investigation by Bell uncovered a photograph of defendant and the fact that the Plymouth was owned by him (Tr. pp. 19–20).

At about 2:30 P.M. on the day of defendant's arrest, January 9, 1978, Bell was told in a telephone call from the same informant that defendant would be in the vicinity of 182nd Street and Valentine Avenue in the Bronx "around 3:00 o'clock" (Tr. p. 41); that "he would be carrying a quantity of cocaine" (Tr. p. 13); that he would be using the same Plymouth he was driving in mid-November (Tr. pp. 13, 58–59); and that defendant had now grown a full beard (Tr. p. 14).

Prior to January 9, 1978, the informant had provided DEA agents information on

---

1. The government submits that the informant purchased the sample from defendant and that defendant told the informant about the expected shipment. It requests permission to reopen the hearing to clarify the ambiguity in the record should the Court be of the opinion that these facts are material. The Court has decided this motion on the basis of the present record. The decision whether to request permission to reopen the hearing to supplement the record is one for the government to make and the Court will not comment thereon.

nine or ten occasions (Tr. pp. 12, 69) which led to the arrest and conviction of approximately fifteen persons for narcotics violations (Tr. pp. 59–60, 69). Additionally, this same informant had provided information upon which at least two prior search warrants had been based (Tr. pp. 13, 69).

Since the weather was bad (snow mixed with sleet (Tr. p. 14)) and since the travel time from the DEA Regional Office to the Bronx under normal conditions is about twenty minutes (Tr. p. 14), Special Agents Bell and Victor Aponte ("Aponte") left immediately after the telephone call. When they arrived at 182nd Street near Valentine Avenue, agent Bell saw the Plymouth automobile which the informant had said would be used by defendant (Tr. pp. 13, 15). Next, agent Bell saw Naranjo-Sierra. Bell knew it was Naranjo-Sierra since he had seen him in mid-November and because he had obtained a photograph of him. Now, however—and just as the informant had described—Naranjo-Sierra had a full beard (Tr. pp. 14, 56). Additionally, defendant was carrying a shopping bag (Tr. p. 15). After placing the bag in the Plymouth and cleaning the windows of snow and ice, defendant entered the car and drove away (Tr. p. 21). Bell and Aponte followed.

When Naranjo-Sierra arrived at the Triborough Bridge toll plaza, the agents stopped him. Bell recalls that he and Aponte both approached the driver's window, identified themselves by showing their badges, and asked defendant whether he had a driver's license (Tr. p. 21). Bell then asked what defendant had in the bag and he replied, "Clothing" (Tr. p. 21). Bell said, "Can I look in the bag?" and Naranjo-Sierra said, "Yes" (Tr. p. 21). Both were speaking English. According to Bell, he then went to the passenger side of the car, defendant opened the door and began lifting out some of the clothing from the bag (Tr. p. 22). Bell stopped him, removed the remaining clothing himself and saw a torn paper bag at the bottom of the shopping bag. Through the tear in the paper bag, he saw cash and a plastic bag containing powder (Tr. p. 22). Once Bell saw the cash and powder, he placed defendant under arrest

(Tr. p. 22). A test of the powder for cocaine proved positive (Tr. p. 24).

Aponte's recollection of what occurred at the toll booth is as follows: Once defendant was stopped, Aponte went to the driver's side of the car, showed his credentials and asked defendant to pull over to the side of the plaza (Tr. p. 72). At that time, Bell approached the car on the passenger's side, tapped on the window and indicated to defendant to remove the safety latch. Naranjo-Sierra unlocked the passenger door; Bell opened it and asked, "What's in the bag?" (Tr. p. 87). "Clothing," defendant said, and Bell asked if he could look. Defendant nodded his head (Tr. p. 88). Bell then reached in the bag, removing some clothing and eventually found the paper bag, the cash and the cocaine. Naranjo-Sierra was then arrested (Tr. p. 74).

From the Triborough Bridge, defendant was taken to the DEA Regional Office where he was read his *Miranda* rights, then questioned. He first said his name was Carlos Rivera and gave a false address (Tr. p. 28). When Bell confronted him, telling him that he knew defendant's real identity, defendant gave his true name and address (Tr. p. 29). As Bell and defendant were counting the $4,000 cash, defendant offered to give it to Bell if he could walk out (Tr. pp. 29–30).

The government asserts that the arrest of defendant and the seizure of the evidence were proper under any one of three theories: (1) a valid search incident to a lawful arrest; (2) a lawful vehicle search; (3) a proper consent search after defendant had been lawfully stopped. Since I conclude that the search was lawful under the government's first theory, I do not consider the validity of the search under the government's second and third theories.

*Discussion*

If an arrest is legal, the search incident to that arrest is also legal if confined to the arrestee's person and the area within his immediate control. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. Cali-*

*fornia*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). An arrest is legal if based upon probable cause. Probable cause exists when there are present facts and circumstances " 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed." *United States v. Rueda*, 549 F.2d 865, 870 (2d Cir. 1977), *citing United States v. Edmonds*, 535 F.2d 714, 719 (2d Cir. 1976), *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

Indeed, "only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969), *citing Beck v. Ohio, supra*, 379 U.S. at 96, 85 S.Ct. at 228. As the Supreme Court has observed, "In dealing with probable cause, . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

█ The arrest in the present case was prompted by an informant's tip. Therefore, I must consider "whether that hearsay information satisfied the standards formulated by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), (1) that the informant be shown to be reliable and credible and (2) that the information provided demonstrates the underlying circumstances from which the informant concluded that the accused was engaged in criminal activity." *United States v. Edmonds*, 535 F.2d 714, 719 (2d Cir. 1976).

Defendant concedes that the informant in this case is credible, as demonstrated by his "track record," and that the first prong of the test has been satisfied. Defendant argues that the informant's report of January 9, standing alone, is not sufficient to satisfy the second prong of the test because the informant did not disclose in his report how

he acquired his information. The government does not argue to the contrary.

Both parties recognize, however, that: "[I]t is soundly established that an informer's report which itself fails to establish probable cause may be sufficiently corroborated by independent observation of a suspect's conduct, if the latter tends to confirm the information in the report or otherwise to support a conclusion that the suspect is engaged in committing a crime." *United States v. Acarino*, 408 F.2d 512, 515 (2d Cir.), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969). The dispute between the parties in this case centers on whether the agents' independent observations were sufficiently corroborative of the informer's report to establish its reliability.

The government argues that the particularity of the informant's January 9 report tends to show its reliability and that the agents' independent observations of defendant's actions on that day and prior thereto provide the necessary corroboration. Defendant argues that neither the agents' observations of the defendant nor their own investigation corroborated the informant's statement that the defendant was engaged in any illicit narcotics business.

The government contends that in the Second Circuit the corroboration necessary to establish the reliability of an informant's information may relate to only innocent details, citing *United States v. Jackson*, 560 F.2d 112, 121 (2d Cir.), *cert. denied*, 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *United States v. Gonzalez*, 555 F.2d 308, 313 (2d Cir. 1977); *United States v. Rollins*, 522 F.2d 160, 165 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); and *United States v. Sultan*, 463 F.2d 1066, 1069 (2d Cir. 1972). However, in each of those cases, the second prong of the *Aguilar-Spinelli* test was satisfied because the informant stated that he or she had obtained the information that was the basis for the arrest by personal observation or by defendant's own admission. The informant's credibility was "untested" since the informant had no previous track record. The court held that the government could

establish the credibility of the informant by demonstrating that the agents' observations corroborated some of the details in the informant's tip. This case involves the reverse situation: the credibility of the informant is conceded and it is the reliability of the manner in which the informant obtained his information that is in dispute.

A more closely analogous situation was before the Second Circuit in *United States v. Acarino, supra.* In *Acarino,* federal narcotics agents received a tip from an informant, whom defendant conceded was credible, that in about forty-five minutes an individual that the agents already had under surveillance as a suspected heroin dealer was to make a delivery of heroin. The court stated that:

"The information conveyed to the agent here was more specific than that referred to in *Aguilar,* . . . . .

\* \* \* \* \* \*

"In addition, the informer here, as in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), gave the agent a precise prediction of a crime about to occur, unlike *Spinelli* where the information was a more generalized description of criminal activity. Moreover, agent Telb testified that the informer had said that he 'personally knew' that the described delivery was to be made. This emphasis, along with the detailed nature of the information given, suggests that the informer was disclosing firsthand knowledge, rather than a ' "suspicion," "belief" or "mere conclusion," ' *Aguilar,* 378 U.S. at 114, 84 S.Ct. at 1514, or 'a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation,' *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589. Finally, in *Spinelli,* not only was no statement made as to the source of the informer's information but no reason was given for the agent's assertion that the informant was generally reliable, a fact conceded here. Therefore, we do not find impressive the argument that *Aguilar* and *Spinelli* require us to reverse this conviction." 408 F.2d at 514–15.

However, the court did not rest its holding solely on the sufficiency of the informer's report. It determined that probable cause was established by the cumulative effect of the agents' past observations of defendant's activities, the informer's report, and the consistency of defendant's actions with the report.

"In the present case, the credibility of the informer's report was reinforced by appellant's conduct both before and after the informer's urgent telephone call. Before it was received, the agents' observations of appellant receiving money from a known narcotics violator, patronizing establishments known to be frequented by dealers in narcotics, and transferring his license plates less than two days before the purported delivery attempt all supported the inference that appellant was engaged in illegal activities. Immediately after the informer's call, appellant left the building approximately half an hour before the delivery was reportedly scheduled, engaged in evasive driving, and just prior to arrest apparently tried to dispose of a small shiny object in his hand." *Id.* at 515.

The facts in the case *sub judice* are not as compelling as those found in *Acarino.* There is no testimony here that the informant personally knew that defendant was in possession of cocaine or that defendant engaged in suspicious conduct before he was arrested. Nevertheless, the Court concludes that the cumulative effect of (1) the agents' observations of defendant prior to January 9, 1978; (2) the information relating to defendant supplied by the informant prior to January 9; (3) the informant's report of January 9; and (4) the consistency of defendant's actions on that date with the report, was sufficient to establish probable cause that defendant, when arrested, was engaged in a violation of the narcotics laws.

The informant told Bell that in approximately thirty minutes, defendant would be at a certain place in the Bronx, using the same Plymouth automobile he had driven in mid-November, and that defendant would be carrying a quantity of cocaine. Arriving

on the scene at about 3 P. M., Bell spotted the Plymouth and shortly thereafter, defendant. As in *Acarino* and the cases cited therein, see page 30 *supra*, the informer gave the agents a precise prediction of a crime about to occur.

In addition, the agents knew that the Plymouth now owned by defendant had been previously utilized by a convicted cocaine peddler, that the informant had previously reported that defendant was expecting a large shipment of cocaine and that the same informant had purchased a sample of that cocaine only a month and a half prior to January 9. The informant's report concerning the mid-November events was not too remote to be relevant to a determination of probable cause to believe that defendant possessed cocaine on January 9 and the agents could take those facts into account in determining whether there existed probable cause to arrest defendant.

In *United States v. Repetti*, 364 F.2d 54 (2d Cir. 1966), the court found probable cause for an arrest on less compelling facts. An informant who had proved to be very reliable in the past gave an agent a physical description of a man who would be delivering an ounce of heroin at a particular location on a particular afternoon and described the car he would be driving. Federal narcotics agents were posted at the place referred to by the informant and at five o'clock defendant drove up in an automobile fitting the informant's description. The court held that the "past reliability of the informant, especially when taken together with the accuracy of the information provided on the occasion in question, was sufficient to constitute probable cause . .." *Repetti*, although decided before several of the relevant Supreme Court cases, was cited with approval by the Second Circuit in *Acarino*. 408 F.2d at 515.

For the foregoing reasons, the Court finds that the arrest was lawful. The subsequent search of the shopping bag in the front floorboard of defendant's car was a valid search incident to that lawful arrest.[2]

Defendant's motion to suppress the evidence seized by Special Agents Bell and Aponte on January 9, 1978, is denied.

So ordered.

---

**2.** Defendant does not assert that the search of the shopping bag in the front floorboard of his car was outside the permissible scope of a valid search incident to an arrest.