Clarissa MARSH, Petitioner-Appellant,

v.

Gloria RICHARDSON,
Respondent-Appellee.

No. 84–1777.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 7, 1985.

Decided Jan. 23, 1986.

R. Steven Whalen (argued), Detroit, Mich., for petitioner-appellant.

Andrea L. Solak (argued), Detroit, Mich., for respondent-appellee.

Before MERRITT and CONTIE, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CONTIE, Circuit Judge.

Clarissa Marsh appeals from an order of the district court denying her petition for a writ of habeas corpus in which she alleged that her convictions for felony murder and assault with intent to murder were not supported by sufficient evidence and that introduction of the statement of her non-testifying co-defendant violated her right of confrontation guaranteed by the Sixth Amendment. Finding that the convictions were obtained in violation of the Constitution, we reverse the judgment of the district court and remand with instructions to grant the writ.[1]

1. Since we conclude that the convictions were obtained in violation of the Sixth Amendment,

## I.

Petitioner Marsh was tried jointly with her co-defendant Benjamin Williams pursuant to an information charging her with the felony murder of Ollie Scott and Koran Knighton in the perpetration of a robbery pursuant to Mich.Comp.Laws Ann. § 750.316 and with assault of Cynthia Knighton with intent to murder pursuant to Mich. Comp.Laws Ann. § 750.83.

Cynthia Knighton testified that on October 29, 1978, she went with her son to the house of her aunt, Ollie Scott. Knighton was upstairs with her son when she heard voices downstairs, and came downstairs and saw Martin, Marsh's boyfriend, and Marsh. Scott introduced Knighton to Marsh, they all sat down and conversed, and Marsh said she had come to pick something up. Martin pulled out a gun, pointed it at them, and said "someone had gotten killed and that my aunt knew something about it." Marsh said something similar, and walked over to the front door. Martin grabbed Scott, and Marsh looked out the peephole. The doorbell rang and Marsh let in defendant Williams, holding a handgun. Williams said "I'm so-and-so's brother," and "[w]here's the money?" Martin took Scott upstairs, and Williams walked through the lower level of the house, at which time Knighton attempted to flee through the front door. Marsh grabbed her and held her until Williams returned, whereupon he told the Knightons to lay on the floor. Williams went upstairs and Marsh refused to give Knighton a drink of water, but looked out the peephole. When the three came downstairs, Martin gave Marsh a paper grocery bag. Martin took Scott to the basement and Williams took the Knightons into the basement. Williams said "Hurry up and tie them up," and Martin said "We're going to have to hurt them." Knighton heard two shots. Then Martin, holding a blanket in front of his gun, shot Knighton three times. Thereafter, she telephoned the police.

Defendant Marsh objected at trial to the introduction of Williams' statement to the police even after the references to Marsh had been deleted: "[T]here are certain inferences that are raised by this statement even in its altered form that would tend to incriminate my client." The court overruled petitioner's objection and allowed introduction of Williams' statement as follows:

On Sunday evening, October the 29th, 1978, at about 6:30 p.m., I was over to my girl friend's house at 237 Moss, Highland Park, when I received a phone call from a friend of mine named Kareem Martin. He said he had been looking for me and James Coleman, who I call Tom. He asked me if I wanted to go on a robbery with him. I said okay. Then he said he'd be by and pick me up. About 15 or 20 minutes later Kareem came by in his black Monte Carlo car. *I got in the car and Kareem told me he was going to stick up this crib, told me the place was a numbers house. Kareem said there would be over $5000 or $10,000 in the place. Kareem said he would have to take them out after the robbery.* Kareem had a big silver gun. He gave me a long barrelled .22 revolver. We then drove over to this house and parked the car across the big street near the house. The plan was that I would wait in the car in front of the house and then I would move the car down across the big street because he didn't want anybody to see the car. Okay, Kareem went up to the house and went inside. A couple of minutes later I moved the car and went up to the house. As I entered, Kareem and this older lady were in the diningroom, a little boy and another younger woman were sitting on the couch in the front room. I pulled my pistol and told the younger woman and the little boy to lay on the floor. Kareem took the older lady upstairs. He had a pistol, also. I stayed downstairs with the two people on the floor. After

---

we need not address petitioner's contention that the insufficiency of the evidence violated due process.

Kareem took the lady upstairs I went upstairs and the lady was laying on the bed in the room to the left as you get up the stairs. The lady had already given us two bags full of money before we even got upstairs. Kareem had thought she had more money and that's why we had went upstairs. Me and Kareem started searching the rooms but I didn't find any money. I came downstairs and then Kareem came down with the lady. I said, "Let's go, let's go." Kareem said no. Kareem then took the two ladies and little boy down the basement and that's when I left to go to the car. I went to the car and got in the back seat. A couple of minutes later Kareem came to the car and said he thinks that the girl was still living because she was still moving and he didn't have any more bullets. He asked me how come I didn't go down the basement and I said I wasn't doing no shit like that. He then dropped me back off at my girl's house in Highland Park and I was supposed to get together with him today, get my share of the robbery after he had counted the money. That's all.

(Emphasis added). The court delivered the following instruction to the jury.

The statement of co-defendant Williams has been admitted into evidence against him only. I caution you that it may be used in considering only the guilt or innocence of Defendant Benjamin Williams. Under the rules already given to you, it must not be used or considered in any way against Defendant Clarissa Marsh.

Marsh testified that she met Martin in 1977 and had a relationship with him. Marsh testified that she often borrowed money so that Martin could purchase drugs. Martin lived in Marsh's house and refused to leave at her direction. Martin physically abused Marsh and in June 1978 she was hospitalized following a suicide attempt. Marsh worked with and borrowed money from Ollie Scott in the summer of 1978.

On October 29, 1978, Marsh lost her wallet with Martin's drug money at Eastland Shopping Center. Martin was upset and suggested that Marsh borrow money from Scott. After dropping her children off at a Halloween party, Marsh and Martin picked up Williams. Petitioner stated that during the drive to Scott's house, she heard no conversation about a robbery. Martin and Marsh went to Scott's house where Marsh asked for a loan. Martin pulled a gun out and Marsh walked over to the door. Marsh testified that she looked out the door to see where the car was, that she did not feel free to leave, and that she opened the door to let Williams in. Marsh testified that she did not try to escape because she was scared and Marsh admitted that she blocked Knighton's attempt to escape but does not know why or what happened. Martin came downstairs and handed Marsh a bag. Marsh testified that she never heard anything said about anyone being hurt, shot or killed. After Martin, Williams and the victims went into the basement, Marsh left the house without the bag. Marsh testified that she never intended to rob or kill anyone, and that she did not know that anyone was armed.

In closing argument, the prosecutor noted:

[T]he same law that applies to Mr. Williams applies to Clarissa Marsh as well. The People must prove the same elements that I talked about in my discussion about Mr. Williams. Her guilt, of course, is to be determined separately from the evidence but you may consider the same evidence that you heard from the witness stand. The only thing that the Court will instruct you that you cannot consider is that statement that was made by the Defendant Williams. You cannot consider that statement when you determine her guilt or innocence. To do so would be unfair.

Further,

[i]t's important in light of her testimony when she says Kareem drives over to Benjamin Williams' home and picks him up to go over. What's the thing that she says? "Well, I'm sitting in the back seat of the car." "Did you hear any conver-

1204

sation that was going on in the front seat between Kareem and Mr. Williams?" "No, couldn't hear any conversation. The radio was too loud." I asked you whether that is reasonable. Why did she say that? Why did she say she couldn't hear any conversation? She said, "I know they were having conversation but I couldn't hear it because of the radio." *Because if she admits that she heard the conversation and she admits to the plan, she's guilty of at least armed robbery.* So she can't tell you that. How else do you know that she planned the robbery and was guilty of First Degree Felony Murder as well as the robbery?

(Emphasis added). Further, "Clarissa Marsh was in the planning stages of the robbery." Defense counsel argued that "[y]ou never heard anything about anyone saying anything in her presence about hurting anyone." In its instructions to the jury, the court repeated its instruction limiting the admissibility of the Williams statement.

On April 23, 1979, Williams and Marsh were convicted on all counts. On May 2, Marsh was sentenced to life imprisonment on the first and second counts and 60 to 90 years on the third count. On December 17, 1980, the Michigan Court of Appeals affirmed the convictions. The court held that the trial court had applied the wrong standard in assessing the motion for directed verdict, but that the evidence was sufficient to support the conviction under the correct standard. The court found that malice could be inferred from Marsh's admission of Williams, Marsh's holding of the grocery bag, Marsh's guarding of the door, and Marsh blocking Knighton's escape. The court stated:

> A split of opinion still exists on this Court over the issue of whether, in a felony-murder case, malice may be imputed from the underlying felony or merely inferred from the circumstances surrounding the killing, including the underlying felony .... We believe *Fountain* presents the better view and hold that malice may not be imputed, as a matter of law, from the underlying felo-

ny. Accordingly, the evidence presented at the time of the motion had to sufficiently show that Williams acted with the intent to kill or in reckless disregard of a known and high degree of risk that death or serious bodily harm might occur.

(Footnote omitted). Further, "[t]he evidence indicated that Marsh knowingly participated in an armed robbery in reckless disregard of circumstances that indicated a high degree of risk that death or serious bodily harm could result." The court also rejected Marsh's Sixth Amendment argument. With respect to the assault charge, the court held:

> [T]he issue is whether the evidence was sufficient to show that Marsh aided and abetted the assault with the specific intent to murder Knighton, or with the knowledge that Martin had this specific intent.... Marsh's case presents a much closer question on this issue than does Williams'. *There was no testimony indicating she harbored an intent to murder Knighton, nor was there any showing that she heard Martin's statements regarding the need to "hurt" or "take out" the victims. There was, in addition, no testimony placing her in the basement, the scene of the shootings.* The evidence does indicate, viewed in the light most favorable to the prosecution, that she was aware that Williams and Martin were armed, that she served as a guard or "lookout" at the door, that she prevented an attempted escape by Knighton, and that she was given the paper bag thought to contain the proceeds of a robbery. The evidence also indicates that Marsh knew Scott, supporting the inference that it was Marsh who allowed Martin to gain entrance. While it is a close question, we believe the evidence presented at the time of the motion was sufficient to survive a motion for directed verdict.

(Emphasis added). On February 5, 1982, the Michigan Supreme Court denied Marsh's application for leave to appeal, and, on April 30, denied her motion for reconsideration.

On July 6, 1983, Marsh filed her petition for a writ of habeas corpus, contending that she was denied her right of confrontation when Williams' statement was read to the jury, and that she was denied due process by denial of her motion for directed verdict when the evidence was insufficient for conviction. On October 11, 1983, the district court denied the petition. The court rejected Marsh's *Bruton* argument on the ground that Williams' statement did not implicate Marsh at all, and that it was improper to consider the other evidence introduced at trial to construe the statement as implicating Marsh. With respect to the sufficiency of the evidence the court adopted the reasoning of the Michigan Court of Appeals. On June 7, 1985, this court granted a certificate of probable cause and appointed counsel.

## II.

The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This guarantee is, of course, applicable to the states by reason of the due process clause of the Fourteenth Amendment, *Harrington v. California*, 395 U.S. 250, 252, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284 (1969); *Smith v. Illinois*, 390 U.S. 129, 133, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), and is " 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment,' " *Brookhart v. Janis*, 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964)); *Smith v. Illinois*, 390 U.S. at 133, 88 S.Ct. at 750; *Pointer*, 380 U.S. at 406, 85 S.Ct at

1069. "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer*, 380 U.S. at 405, 85 S.Ct. at 1068; *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968).[2]

The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895); *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980); *Barber*, 390 U.S. at 721, 88 S.Ct. at 1320. "These means of testing accuracy are so important that the absence of proper confrontation at trial 'calls into question the ultimate "integrity of the fact-finding process." ' " *Ohio v. Roberts*, 448 U.S. at 64, 100 S.Ct. at 2538; *Tennessee v. Street*, —— U.S. ——, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) (Confrontation Clause's mission is "to advance 'the accuracy of the truth-determining process in criminal trials.' "); *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.' "). "[T]he Confrontation Clause is

---

2. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); *Bruton v. United States*, 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 1625 n. 6, 20 L.Ed.2d 476 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence.").

generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the fact-finder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer,* —— U.S. ——, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (*per curiam* ).

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court held that admission in a joint trial of the confession of Bruton's co-defendant Evans violated Bruton's Sixth Amendment right of cross-examination "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's [Bruton's] guilt." 391 U.S. at 126, 88 S.Ct. at 1622. The Court recognized that no Confrontation Clause concern is implicated if the jury follows the court's admonishment to consider the extrajudicial statement only against its maker. *Id.* The Court noted that limiting instructions are effective in some situations. "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Id.* at 135, 88 S.Ct. at 1627. However, the Court recognized that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limita-

tions of the jury system cannot be ignored.... Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

*Id.* at 135–36, 88 S.Ct. at 1627–28 (footnote omitted).[3] Once it is determined that the limiting instruction is ineffective, the extrajudicial statement is viewed as if it were introduced directly against the defendant. "[W]here the jury hears the co-defendant's confession implicating the defendant, the co-defendant becomes in substance, if not in form, a 'witness' against the defendant. The defendant must constitutionally have an opportunity to 'confront' such a witness. This the defendant cannot do if the codefendant refuses to take the stand." *Nelson v. O'Neil,* 402 U.S. 622, 626, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971).

Despite the *Bruton* holding, we recognize the strong presumption that jurors can follow the court's instructions. *Tennessee v. Street,* 105 S.Ct. at 2082 n. 6 ("The assumption that jurors are able to follow the court's instructions fully applies when

---

**3.** The Court recognized that where a limiting instruction was insufficient, the alternatives of separate trials and redaction are possible. *Id.* at 134 & n. 10, 88 S.Ct. at 1626 & n. 10 ("Where viable alternatives do exist, it is deceptive to rely on the pursuit of truth to defend a clearly harmful practice."). While "[j]oint trials do conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial," *id.* at 134, 88 S.Ct. at 1627, " '[w]e secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty. That price is too high.' " *Id.* at 135, 88 S.Ct. at 1627, *quot-*

*ing People v. Fisher,* 249 N.Y. 419, 432, 164 N.E. 336, 341 (Lehman, J., dissenting).

Whether *Bruton* applies in a non-jury trial is unclear. *United States ex rel. Faulisi v. Pinkney,* 611 F.2d 176, 178 (7th Cir.1979); *Cockrell v. Oberhauser,* 413 F.2d 256, 258 (9th Cir.1969), *cert. denied,* 397 U.S. 994, 90 S.Ct. 1130, 25 L.Ed.2d 401 (1970). *But see Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir.), *cert. denied,* 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932) (the limiting instruction is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, *but anybody's else* ") (emphasis added) (*see Bruton,* 391 U.S. at 132 n. 8, 88 S.Ct. at 1626 n. 8).

rights guaranteed by the Confrontation Clause are at issue.").[4] "The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions. *Bruton* was an exception to this rule, created because of the 'devastating' consequences that failure of the jury to disregard a codefendant's inculpatory confession could have to a nonconfessing defendant's case." *Parker v. Randolph,* 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 2140 n. 7, 60 L.Ed.2d 713 (1979).[5] However, "[t]he Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant." *Parker,* 442 U.S. at 73, 99 S.Ct at 2139.

■ *Bruton,* on its face, finds a Confrontation Clause violation where there is a "substantial risk" that the jury looked to the statements in question in determining the petitioner's guilt. In *Parker,* the Court noted that *"Bruton* was tied to the situation in which it arose: 'where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' " 442 U.S. at 75 n. 7, 99 S.Ct. at 2140 n. 7. *See Schneble v. Florida,* 405 U.S. 427, 429–30, 92 S.Ct. 1056, 1058–59, 31 L.Ed.2d 340 (1972). More recently the Court has cast the *Bruton* question as "whether, in light of the competing values at stake, we may rely on the ' "crucial assumption" ' that the jurors followed ' "the instructions given them by the trial judge." ' " *Tennessee v. Street,* 105 S.Ct. at 2082 (citations omitted). Accordingly, the critical factor in assessing an alleged Confrontation Clause violation is

the likelihood or probability that the jury will consider inadmissible evidence in assessing a defendant's guilt. We appropriately require that such likelihood or risk of jury misconduct be "substantial" or more than a theoretical risk in light of the strong presumption of jury compliance with the court's instructions. In assessing whether such a substantial likelihood exists, the contested statement, its incriminatory nature, and its role in the case figure prominently.

None of our Circuit's precedents provide guidance respecting this precise factual situation. In *United States v. Dady,* 536 F.2d 675 (6th Cir.1976), the trial court admitted a statement by Dady's co-defendant Harrison, that he, Harrison, went to the bank with the intent to rob it. Dady argued that other evidence in the case demonstrated that Dady accompanied Harrison to the bank, and that, therefore, the jury could infer that Dady had the same intent. We rejected this argument, holding that:

> If an inference arose that Dady and Ransom intended to rob the bank, it arose from the fact that independent evidence showed that they had accompanied Harrison to the bank, had discussed robbing the bank, and had discussed obtaining guns for that purpose. None of this evidence came from the confession, but came directly from the testimony of Steele and Cross.

*Id.* at 678. We found that the inference that Dady had the requisite intent was likely to be drawn from the independent evidence, rather than from Harrison's confession, and that, therefore, there was no substantial likelihood that the jury would ignore its instructions.

In *Hodges v. Rose,* 570 F.2d 643, 646 (6th Cir.), *cert. denied,* 436 U.S. 909, 98 S.Ct. 2243, 56 L.Ed.2d 408 (1978), we held that

---

**4.** *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

**5.** The *Parker* plurality held that reversal based on *Bruton* was limited to situations in which "the implicated defendant has made no extrajudicial admission of guilt." 442 U.S. at 74, 99 S.Ct. at 2140. Although Marsh described her participation in the scheme in this case, she admitted no guilt, and her testimony and Williams' statement do not "interlock" regarding the crucial facts relative to intent.

the extrajudicial statement must "clearly implicate" the defendant. We held further that the court may consider "other evidence" in assessing the incriminatory effect of the statement, but that consideration of the weight of other evidence and the importance of the contested evidence to the prosecution is both improper and unnecessary. *Id.* at 647.[6] *See generally United States v. Pickett,* 746 F.2d 1129, 1133 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *Elliott v. Thompson,* 599 F.2d 767, 769 (6th Cir.), *cert. denied,* 444 U.S. 932, 100 S.Ct. 278, 62 L.Ed.2d 190 (1979); *United States v. Marks,* 585 F.2d 164, 168 (6th Cir.1978); *Burkhart v. Lane,* 574 F.2d 346, 348 (6th Cir.1978) (inquiry is whether "there is a 'substantial risk' that the jury used the statement in deciding [defendant's] guilt."). In *Poole v. Perini,* 659 F.2d 730, 733 (6th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 450 (1982), we reiterated that the "out-of-court statement must clearly implicate the defendant and create a substantial risk that the jury looked to the incriminating extrajudicial statements in determining guilt."

In *Lyle v. Koehler,* 720 F.2d 426 (6th Cir.1983), letters of a co-defendant, Kemp, referred to an individual named "Rock" and noted that Rock and Kemp had been arrested together. From other evidence in the case, the jury knew that Lyle was arrested with Kemp. Applying the standards enunciated in *Hodges,* we found a Sixth Amendment violation. "That the

jury had to draw a short chain of inferences in order to link the letters and Lyle's participation in the crime does not dissuade us from concluding that the letters constituted a substantial portion of the state's evidence against him." 720 F.2d at 435. We distinguished *Dady* on the ground that, in that case, the extrajudicial statement included no mention of an individual who might be construed as the defendant. *Id.* at 434 n. 14.

Perhaps the most analogous case is *United States v. Gonzalez,* 555 F.2d 308 (2d Cir.1977), in which the co-defendant's statement indicated that a set of keys belonged to the person who gave him cocaine. An FBI agent testified that the keys fit Gonzalez's apartment, and the prosecution argued that linkage between the two statements. The court phrased a two-part exception to the *Bruton* exception to the rule that it is presumed that a jury will comply with its instructions. No substantial risk that the jury disregarded its instructions is deemed to exist "when the jury had to make a substantial inference to identify a co-defendant as the person mentioned in the out-of-court confession *and* when the evidence, even if incriminatory, could not have constituted a vital part of the Government's case against the co-defendant." *Id.* at 316. The court concluded that other evidence against Gonzalez was only circumstantial and that the extrajudicial linkage was the only so-called "direct" evidence, and, therefore, violated *Bruton.* Similarly,

---

6. We held that:

[A] trial court cannot decide on the admissibility of a statement under *Bruton* on the basis of the strength of the state's case. Rather, the court must decide whether the statement incriminates the defendant against whom it is inadmissible in such a way as to create a "substantial risk" that the jury will look to the statement in deciding on that defendant's guilt. Such an assessment may require consideration of other evidence in order to determine whether mere deletion of the defendant's name will be effective in making the statement non-incriminating as to him. But consideration of the weight of independent evidence is both improper and unnecessary to determination of the *Bruton* issue at the trial court level.

*Id.* at 647 (footnote omitted). Further,

[a] judge can decide at the outset, however, whether a codefendant statement is likely to incriminate other defendants in such a way as to create a substantial *risk* that the jury will consider it in deciding on the guilt of those defendants. If the incriminating references ultimately add little to the government's case, then their exclusion does no harm, and the confrontation rights of the defendants are preserved. We do not read *Bruton* as guaranteeing a right of confrontation only as against testimony that proves to be vital to the prosecution's case. *Contra, United States v. Gonzalez,* 555 F.2d 308, 316–17 (2d Cir.1977); *United States v. Wingate,* 520 F.2d 309, 313–14 (2d Cir.1975).

*Id.* at n. 9.

in this case, the evidence of intent to kill or malice was entirely circumstantial with respect to Marsh with Williams' reference to the possibility of killing the robbery victims the only link between Marsh and knowledge that violence or death was a part of the robbery scheme.

In *Clark v. Maggio*, 737 F.2d 471 (5th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1761, 84 L.Ed.2d 823 (1985), four police department employees testified that the defendants' (Clark and Benion) co-defendant, Mikell, told them that all three had formulated the idea for the robbery and that all three had guns, although the witnesses never indicated who Mikell's compatriots were. The court found:

> This evidence, not duplicated by testimony from witnesses subject to cross-examination, directly implicated Mikell's companions in the crime. Although no names were mentioned, the jury might well have filled in the blanks from the prior testimony that Mikell had provided the police with two names, deducing that those names were those of Mikell's codefendants. Even if we assume the jury did not draw this inference of its own accord, the prosecutor, in his closing argument, supplied the names that the trial judge ordered omitted: "So consequently if Clark was with Mikell and Benion was with Clark, then they were all together. And if all three planned it, *as Mikell said they did,* then under the law of principals, all three of them are guilty of the crime ... of first degree murder ...."
>
> . . . . .
>
> This conduct was not per se a violation of the confrontation clause, for the prosecution was not a witness against the accused. It was, however, grossly improper, for it constituted an effort by the prosecutor to supply information to the jury that was not only not in the record but had been ruled inadmissible.

*Id.* at 477–78 (footnote omitted). The court did not find reversible error, however, because the petitioner had not objected at trial and the error did not rise to the level of plain error. *Clark,* however, indicates that prosecutorial linkage of defendant and inadmissible evidence, as in this case, is persuasive in finding a Sixth Amendment violation.

The Seventh Circuit has likewise deemed it proper to look at the other evidence beyond the extrajudicial statement itself in assessing the statement's potential incriminatory impact. "The introduction of a confession from which the names of co-defendants have been excised may violate the *Bruton* rule if *in context* the statement is clearly inculpating of a co-defendant, and vitally important to the Government's case." *English v. United States,* 620 F.2d 150, 152 (7th Cir.), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980) (emphasis added). It is the strength of the resulting inculpatory inference and not the fact that it had its genesis in both inadmissible and admissible evidence that determines whether the Sixth Amendment is violated. "Where the context may permit an inculpating inference, but does not compel it, no *Bruton* violation exists." *Id.* at 153. The court disapproved of the test or standard which measures the inculpatory value of the extrajudicial statement solely by reference to the statement itself.

> This test, however, insufficiently protects *Bruton* rights, which may be violated if as in *Gonzalez* the challenged statement in the context of other evidence directly and inevitably compels an inculpating inference. A *Gonzalez* type statement should satisfy the *Bruton* standard of a "powerfully incriminating extrajudicial statement," ... even though reference to other evidence is necessary.

*Id.* at 153 n. 7. The court indicated a willingness to follow a version of the Second Circuit's test, rejected by this Circuit in *Hodges,* which, to find a Sixth Amendment violation, requires a showing that the extrajudicial statement is powerfully incriminatory and that the statement is vitally important to the government's case. In *United States v. Key,* 725 F.2d 1123 (7th Cir.1984), the court followed *English* in a case where co-defendant Baker testified

that an "accident" in issue had been staged, but never mentioned Key. It was uncontested that Key was involved in the accident. "Baker's admission that the accident was staged, then, was the equivalent of a statement that Key was lying. As such, it directly implicated Key." *Id.* at 1126. *See United States v. DeStefano*, 476 F.2d 324 (7th Cir.1973). *But see United States ex rel. Cole v. Lane*, 752 F.2d 1210, 1216 (7th Cir.1985) (citing *United States v. Belle*, 593 F.2d 487 (3d Cir.), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979)); *United States v. Madison*, 689 F.2d 1300, 1309 (7th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983).

Other circuits have generally disapproved of looking beyond the face of the contested extrajudicial statement in determining its incriminatory value, labeling such practice as contextual implication or evidentiary linkage. The strongest condemnation of such a practice is *United States v. Belle*, 593 F.2d 487 (3d Cir.1979), by the *en banc* Third Circuit. In *Belle*, an FBI agent testified that Belle's co-defendant Munford said he was going to deliver heroin to a trash can near a Krispy Kreme Doughnut Shop between 8:00 and 8:30, that he had previously transported heroin into the area and had met with O'Neil Roberts on two occasions. Other evidence in the case indicated that Belle had been arrested with Roberts. Belle argued that the jury could infer that the other heroin transactions referred to by Munford were with Roberts, and that Belle was involved in the transaction covered by the indictment because he had been arrested with Roberts. The court held that "[w]hen a codefendant's extrajudicial statement does not directly implicate the defendant, however, the *Bruton* rule does not come into play." 593 F.2d at 493. "It was in such a circumstance—where the challenged *statement* (and we emphasize, the *statement only* ) directly implicated the complaining defendant Bruton—that the Supreme Court held that the codefendant's statement could not be admitted into evidence at a joint trial." *Id.* "In short, evidentiary linkage or contextual implication may not be utilized to convert a non-*Bruton* admissible statement into a *Bruton* inadmissible statement." *Id.* at 494.[7] As support for its conclusions the court noted that the "connecting testimony" was subject to cross-examination.[8]

---

**7.** The court relied on the Second Circuit cases of *United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) and *United States ex rel. Nelson v. Follette*, 430 F.2d 1055 (2d Cir.1970), *cert. denied*, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed. 2818 (1971). In *Wingate*, the court applied the two-part powerfully incriminating/vitally important test and found that the extrajudicial statement in issue was not powerfully incriminating because "[o]nly when combined with considerable other evidence, which amply established Wingate's guilt, do the statements tend to implicate him." *Id.* at 314. In *Nelson*, the court likewise found no *Bruton* problem.

> [W]here the jury would have had to make a substantial inference to inculpate appellant on the basis of his codefendant's statements, an inference possible only because of other testimony independently subject to cross-examination, and where the information, even if possibly incriminatory of appellant, could not have constituted a vital part of the Government's case against him, we hold that the cautionary instructions given by the trial court were adequate to protect appellant's constitutional rights.

*Id.* at 1059. Obviously, neither of these cases support the strident blanket statements of *Belle* barring evidentiary linkage in all cases. *Wingate* and *Nelson* simply stand for the proposition that a statement is more likely to be powerfully incriminatory the more directly it implicates the defendant and that where there is other substantial evidence from which the same fact might be inferred there is not substantial risk that the jury relied on the inadmissible evidence in reaching its verdict. The cases in no way bar linkage in every case.

**8.** The court also cited the impracticalities of allowing linkage.

> If linkage evidence was subsumed by the Court in its *Bruton* ruling, it is apparent that such linkage evidence would be required to be subjected to judicial scrutiny together with the defendants' statements or confessions. No such suggestion is even intimated by *Bruton*, and it is understandable why it was not. To require what Belle seeks here would lead to the necessity for the Government to expose its entire case on a motion for severance. Indeed, whether or not a motion for severance is ever made, such a result would require the trial judge to examine under a microscope all

In this case, Marsh's own testimony connects her to the car ride in which the killings were allegedly discussed. The value of cross-examining herself, of course, is non-existent. The only way Marsh can challenge what happened in the car on the way to the robbery is to cross-examine Williams to corroborate her story, undermine his credibility or further set before the jury the circumstances under which the discussion of the killing took place. *See also Rawls v. Patton*, 585 F.Supp. 181, 185 (E.D.Pa.1984). Five other circuits have expressed a preference of varying degrees for a standard in which the inculpatory value of a statement is measured by reference to the statement alone.[9]

the prosecution's evidence in order to determine whether any extrajudicial statement made by a nontestifying codefendant could be admitted as to that defendant, or whether it would have to be excluded because of the existence of independent "linkage" evidence which might connect another defendant to the statement. This result would necessarily lead to either a complete "mini-trial" before the judge, or to the practical prohibition of joint trials. *See* pages 493 494 *supra; United States v. Mulligan* [488 F.2d 732 (9th Cir.1973) ] *supra.* The federal rules do not contemplate such a practice, see Fed.R.Crim.P. 14; *Bruton* itself never suggested such an astonishing result; and no other court, to our knowledge, has construed *Bruton* in the unprecedented fashion urged upon us by Belle.

*Id.* at 495–96. We, of course, have little to add to the Supreme Court's rejection of a similar argument in *Bruton*. *See* note 3, *supra; Bruton*, 391 U.S. at 135, 88 S.Ct. at 1627.

**9.** *See Serio v. United States*, 401 F.2d 989 (D.C. Cir.1968). The First Circuit has held that "[t]he fact that a codefendant's admission tended to corroborate the government's case ... is simply not enough." *United States v. DiGregorio*, 605 F.2d 1184, 1190 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). "[W]here the confession does *not* name a codefendant, it may be admitted ... solely against the confessor, and a limiting instruction does serve to reduce any prejudicial inferences the jury might draw." *Id.* *See United States v. Greenleaf*, 692 F.2d 182, 189 (1st Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *United States v. Cleveland*, 590 F.2d 24, 27–28 (1st Cir.1978). *See also United States v. Porter*, 764 F.2d 1 (1st Cir.1985). The Second Circuit has recently held that "[a] defendant's *Bruton* rights would be violated, however, only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence." *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Burke*, 700 F.2d 70, 85 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Slocum*, 695 F.2d 650, 655 (2d Cir.1982), *cert. denied*, 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983) ("Where ... the inculpatory impact upon the defendant of the statements is defused because it depends upon other prosecution evidence to connect the defendant to the subject of the statements, the *Bruton* rule is not violated."). *See also United States v. Marin*, 669 F.2d 73, 83 (2d Cir.1982); *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States ex rel. LaBelle v. Mancusi*, 404 F.2d 690 (2d Cir.1968). The Fifth Circuit has held that "the *Bruton* rule is not violated unless a codefendant's statement directly alludes to the complaining defendant ... This is true, even if the evidence makes it apparent that the defendant was implicated by some indirect references." *United States v. Webster*, 734 F.2d 1048, 1054 n. 6 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); *United States v. Heffington*, 682 F.2d 1075, 1083 (5th Cir. 1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); *United States v. Stewart*, 579 F.2d 356, 359 (5th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978). The Ninth Circuit has likewise rejected evidentiary linkage. "Cases subsequent to *Bruton* have distinguished—as admissible—a codefendant's admission which is a vague reference from which guilt might be inferred from other facts and evidence.... Although the statements admitted here did serve to tie Tavelman and Job to one another in the crime, they were not incriminating without reference to other, admissible evidence." *United States v. Tavelman*, 650 F.2d 1133, 1139 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982). *See United States v. Wright*, 742 F.2d 1215, 1223 (9th Cir.1984). The Eleventh Circuit has held that "[f]or *Bruton* to apply, a codefendant's statement must be clearly inculpatory standing alone." *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). *See also United States v. Garrett*, 727 F.2d 1003, 1013 (11th Cir. 1984), *aff'd*, —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

The Supreme Court has implicitly avoided the evidentiary linkage question. In *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the trial court admitted a statement by the co-defendant Snell indicating that petitioner Schneble had never left Snell alone in the car with the victim. Snell did not say that Schneble committed the crime. However,

**1212**

We reject the approach which limits the appraisal of the inculpatory value of an extrajudicial statement to the face of the statement itself. Such an approach ignores the true incriminatory effect of the statement, and, with no countervailing benefit, sanctions the use of admittedly inadmissible evidence while ignoring the practical limitations inherent in the jury system as recognized by the Court in *Bruton*. Sanctioning the admission of an extrajudicial statement in circumstances in which a substantial risk exists that the statement will be used against the defendant not only denies the Sixth Amendment right to confrontation, but raises serious due process concerns regarding the validity of the conviction and the fundamental fairness of the trial process. It is no answer to this unfairness to say that the evidence that set the stage was subject to cross-examination.

Circuit precedent provides that the determination of whether there exists a substantial risk that the jury might have considered Williams' statement "may re-quire consideration of other evidence." *Hodges v. Rose*, 570 F.2d at 647. Examining all the circumstances in this case it is clear that the statement on its face did not incriminate Marsh, and that Marsh's testimony placing herself in the car where Williams' statement indicated that the robbery and murder were discussed provided the evidence that Marsh had prior knowledge of the plan. The court instructed the jury to consider Williams' statement only against Williams, not Marsh. The prosecution, however, in closing argument, questioned Marsh's testimony that she heard no discussion of the planned robbery and suggested that, in fact, the robbery had been discussed in the car. Especially pertinent in this case is (1) that the prosecution in closing argument pointed out the impermissible linkage to the jury, (2) that the killings were discussed in the car, providing evidence of Marsh's knowledge of a plan encompassing murder, and (3) that intent or malice is a critical element of both offenses under Michigan law.[10]

Schneble claimed that he had left Snell alone in the car. Therefore, Snell's statement conflicted with Schneble's defense. While determining that any error was harmless, the Court noted:
> While Snell's statement fell far short of the type of comprehensive and detailed confession made by petitioner, it did tend to undermine petitioner's initial (but later abandoned) claim that he had left Snell alone during the time at which the murder occurred. Snell's statement also placed petitioner in the position in the car from which the victim could more easily have been strangled. Thus, petitioner claims, the introduction of Snell's out-of-court statement, not subject to effective cross-examination, deprived petitioner of his right of confrontation in violation of *Bruton*. *Id.* at 429.

10. Mich.Comp.Laws Ann. § 750.83 provides that "[a]ny person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony...." Marsh was convicted as an aider and abettor in this case. "Assault with intent to murder is a specific intent crime.... The two elements of the offense which must be proven at trial consist of: (1) an assault; and (2) an intent by the defendant to murder the complainant at the time of the assault." *People v. Marlin Smith*, 119 Mich.App. 91, 93, 326 N.W.2d 434 (1982); *People v. Branner*, 53 Mich.App. 541, 220 N.W.2d 183 (1974). "Positive proof of an intent to kill is not required; rather, there need only be evidence of an intent to kill or evidence from which an intent to kill may be inferred." *People v. Moore*, 129 Mich.App. 354, 356, 341 N.W.2d 149 (1983). "[I]t is essential that the prosecution prove beyond a reasonable doubt that the defendant possessed specific intent or that he aided and abetted in the perpetration of the crime knowing that his coparticipants had the necessary specific intent.... The requisite intent may properly be inferred by the jury from circumstantial evidence." *People v. Sharp*, 57 Mich.App. 624, 626, 226 N.W.2d 590 (1975); *People v. Fields*, 64 Mich.App. 166, 173–74, 235 N.W.2d 95 (1975); *People v. Poplar*, 20 Mich. App. 132, 136, 173 N.W.2d 732 (1969).

Mich.Comp.Laws Ann. § 750.316 provides that "[a]ll murder which shall be ... committed in the perpetration, or attempt to perpetrate ... robbery ... shall be murder of the first degree." "[T]o constitute murder there must be (1) a homicide, (2) committed with malice, either express or implied." *People v. Fountain*, 71 Mich. App. 491, 499, 248 N.W.2d 589 (1976).
> Malice is not ... imputed to an act of killing from the intent to commit an underlying felony. Although malice may be inferred from the nature of the underlying felony and the circumstances surrounding its commission, the presence or absence of malice in each case remains a question for jury determination.
> *Id.* at 505–06.

There is no doubt that in the context of the evidence in this case, admission of the statement in the joint trial of Williams and Marsh was powerfully incriminating to Marsh with respect to the critical element of intent. The paucity of other evidence of intent and the prosecution's use of the Williams confession against Marsh created a substantial risk that the jury would consider Williams' statement in their deliberations regarding Marsh's guilt. Accordingly, we conclude that Marsh's due process right to confrontation was violated by admission of the statement despite the limiting instruction.

Although we recognize that direct restrictions on the right of cross-examination are unconstitutional regardless of the absence of prejudice to the defendant, *United States v. Bagley,* — U.S. —, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985); *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984); *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974); *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968); *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966), it is clear that constitutional deprivations akin to that in *Bruton* are subject to harmless error analysis, *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) ("We reject the notion that a *Bruton* error can never be harmless. '[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials."); *Parker,* 442 U.S. at 70–71, 99 S.Ct. at 2138; *Schneble,* 405 U.S. at 430, 92 S.Ct. at 1059 ("In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."); *Harrington v.*

*California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).[11] We must make this determination "on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury,' " *Schneble,* 405 U.S. at 432, 92 S.Ct. at 1059 (quoting *Harrington* ), but must not "indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face," *id.* at 432, 92 S.Ct. at 1059. Error is not harmless where "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction," or where the jury would "have found the State's case significantly less persuasive," *id.* The improper admission of a co-defendant's uncross-examined statement is likely to be harmless where the statement is duplicative of other testimony in the case. *Schneble,* 405 U.S. at 431, 92 S.Ct. at 1059.

Under the facts of this case, we are unable to conclude beyond a reasonable doubt that the probable impact of Williams' statement and its use by the prosecution on the minds of an average jury can be deemed harmless. The statement was not merely cumulative nor was the independent evidence of guilt overwhelming. The linkage relied on by the State between Marsh's admission that she accompanied Williams and Martin to the murder scene and Williams' statement that the possibility of killing the victims was discussed in the car, contributed the most direct evidence of malice or intent on Marsh's part. The other evidence in the case was circumstantial and, although probative and perhaps persuasive, under the circumstances and in light of the elements of the offenses charged, we cannot say that introduction of Williams' statement did not render the State's case significantly more persuasive.

11. *See also Fuson v. Jago,* 773 F.2d 55, 61 (6th Cir.1985); *Pickett,* 746 F.2d at 1133; *Clark v. Maggio,* 737 F.2d at 478 n. 30; *Lyle,* 720 F.2d at 435; *United States v. Ruff,* 717 F.2d 855, 858 (3d Cir.1983), *cert. denied,* 464 U.S. 1051, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984); *Klein v. Harris,* 667 F.2d 274, 290–91 (2d Cir.1981); *Mayes v. Sow-* ders, 621 F.2d 850, 856 (6th Cir.), *cert. denied,* 449 U.S. 922, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980); *Elliott v. Thompson,* 599 F.2d 767, 769 (6th Cir.), *cert. denied,* 444 U.S. 932, 100 S.Ct. 278, 62 L.Ed.2d 190 (1979); *Marks,* 585 F.2d at 169; *Burkhart,* 574 F.2d at 349; *Hodges v. Rose,* 570 F.2d at 648.

Accordingly, in light of our conclusions that the convictions in this case were obtained in violation of the Constitution, and that such violations were not harmless beyond a reasonable doubt, we remand the case to the district court with instructions to grant the petition for a writ of habeas corpus.

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.